**SO ORDERED.**

**SIGNED this 20 day of October, 2010.**

*Stephani W. Humrickhouse*
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### WILSON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| **BANNERMAN HOLDINGS, LLC** | **10-01053-8-SWH** |
| DEBTOR | |

### ORDER CONFIRMING PLAN

The matter before the court is the debtor's request for confirmation of its chapter 11 plan and creditor SunTrust Bank's objection to confirmation. A hearing was held in Raleigh, North Carolina, beginning on August 20, 2010, continuing on August 26 and 27, and concluding with a telephonic conference on September 13, 2010. During the September 13 conference, the court advised the parties that SunTrust's objection would be overruled and the plan confirmed. This order sets forth the basis upon which the court arrived at its ruling.

### BACKGROUND

The debtor, Bannerman Holdings, LLC ("Bannerman"), filed a petition for relief under chapter 11 of the Bankruptcy Code on February 12, 2010. Bannerman is a North Carolina limited liability company located in Wilmington, North Carolina, and engaged in the business of buying, selling, and leasing real estate. Bannerman filed its Plan and Disclosure Statement on April 29,

2010. All impaired classes, except that of SunTrust Bank, accepted the plan. The debtor proceeded to cram down asserting that its treatment of SunTrust provided that creditor with the indubitable equivalent of its claim pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii).

The plan, prior to amendment, provided generally that the debtor would transfer to SunTrust eleven of the fifteen unsold condominium units in Bannerman Station Condominium ("Bannerman Station") and the parking lot located on North Front Street in full satisfaction of the SunTrust debt. The plan also provided that the debtor and guarantors would be released. SunTrust contended that the plan's treatment of its claim was not fair and equitable because the debtor's proposed surrender of a portion of SunTrust's collateral would not provide SunTrust with the indubitable equivalent of its claim and would subject SunTrust to competition with the debtor in the marketing of the surrendered units. Additionally, SunTrust objected to the plan's release of the guarantors as being in violation of 11 U.S.C. § 524(e).

At the hearing, the debtor orally modified its plan to provide that the debtor would delay the marketing of three of the four units it retained for a period of eighteen months from confirmation, and that the guarantor release would be removed.[1]

---

[1] On September 15, 2010, upon request of the court, the debtor filed a modification of plan as to Class 4 to evidence the oral modification, which provided that three of the four units to be retained by the debtor "shall not be marketed for an eighteen-month period following the entry of the Order Confirming Plan." It also provided for the removal of language releasing the guarantors, that the debtor would retain the four units not surrendered "free of any claim of interest of SunTrust," and that SunTrust would "mark the promissory note paid in full, and cause its deed of trust to be cancelled."

SunTrust objected to the modification of plan to the extent that this language went "beyond a determination of whether the transfer of the property constitute[d] the indubitable equivalent of SunTrust's secured claim, and directly addresse[d] the issue of potential guarantor liability to which counsel for SunTrust objected." The court held a telephonic hearing on SunTrust's objection to the modification on September 29, 2010. Based upon the court's comments, the debtor agreed to further

During the course of the protracted hearing, evidence of eleven appraisals, generated by three different appraisers and performed between July 2008 and August 2010, was introduced. Bannerman Station was valued at a high of $8,750,000 on July 8, 2008, by Mr. Hector Ingram and a low of $3,450,000 on December 16, 2009, by the same appraiser. The parking lot was valued at a high of $1,550,000 on August 10, 2010, by Mr. Earl Worsley and a low of $1,300,000 on July 6, 2010, by Mr. Ingram. All of the appraisals, except for the May 25, 2010, appraisal performed by Mr. W. Lawrence Robertson on the parking lot property, were commissioned by SunTrust or its counsel.

## DISCUSSION

**The Claim**

In order to evaluate the adequacy of the debtor's treatment of SunTrust's claim, the court must first determine the amount of that claim. Although that inquiry is an obvious one, its resolution is not straightforward. SunTrust's original proof of claim was filed on March 3, 2010, in the amount of $5,592,120.32. Documents supporting the claim were attached, including loan documentation as well as a summary titled "Itemization of Claim," which broke the claim into separate components: principal, interest, late charges, pre-petition attorney fees and foreclosure costs, expenses, and appraisal fees.

SunTrust filed an amended proof of claim on March 29, 2010, which asserted a secured claim in the amount of $4,882,970.18. Only an updated Itemization of Claim was attached to the amended proof of claim. SunTrust did not file the writing on which the amended proof of claim was

---

modify its plan to remove the requirement that the promissory note be marked paid in full, and SunTrust withdrew its objection. On October 1, 2010, the debtor filed a second modification consistent with the agreement reached during the telephonic conference.

based, i.e., the loan documents, with the amended proof of claim.[2] There is no dispute with respect to the details of the underlying loan or the loan documents filed with the original proof of claim, and neither the debtor nor SunTrust has raised any issue with respect to the loan documents, so SunTrust's failure to attach them to the amended proof of claim is of little import. The relevant documents were attached to the original proof of claim, and it appears to the court that the amended proof of claim is more in the nature of an amendment to claim.

On August 20, 2010, the first day of testimony, SunTrust representative Rob Wilkinson testified on direct examination that Suntrust held a claim of $4,725,000, which included "just principal and interest." Prior to the start of the second day of testimony, SunTrust filed a Motion for Estimation of Claim in the Event of Objection, seeking an estimation of its claim for voting purposes if the debtor filed an objection to its claim. In response, the debtor advised the court at the hearing on August 26, 2010, that it would not object to the SunTrust proof of claim, thus obviating the need to estimate the claim.

SunTrust's motion to estimate, however, did effectively "amend" the amended proof of claim to reflect a monetary credit on behalf of SunTrust for proceeds of the § 363 sale of Unit 202 at Bannerman Station, which took place on April 26, 2010. After such credit, SunTrust stated in its pleading that its secured claim had been reduced to $4,642,660.44. That number exactly coincides with the claim amount provided in the debtor's Class 4 plan treatment.

---

[2]See Fed. R. Bankr. P. 3001(c) ("When a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.").

The amended proof of claim alluded to SunTrust's entitlement to seek post-petition fees and costs by including a notation at the bottom of the Itemization, which provided: "*plus interest and all reasonable fees, costs or charges provided for under the Agreement or State statute under which this claim arose." SunTrust Am. Proof of Claim, Attach. A. However, there was no additional testimony regarding post-petition fees and costs. Accordingly, there is no evidentiary basis on which the court may consider whether or not to award them. SunTrust's claim, therefore, will be set at $4,642,660.44 for purposes of confirmation.

**Cramdown**

Because at least one impaired class has accepted the plan, the court may confirm the plan notwithstanding SunTrust's objection if the plan does not discriminate unfairly and is fair and equitable to SunTrust. 11 U.S.C. § 1129(b). A secured creditor's treatment may be deemed fair and equitable if it satisfies one of the three criteria set forth under § 1129(b)(2)(A). The debtor contends that its treatment of SunTrust provides "for the realization by [SunTrust] of the indubitable equivalent of [its] claims." § 1129(b)(2)(A)(iii).

There is some disagreement among courts as to the evidentiary standard to apply. Some courts have determined that indubitable equivalence must be established by clear and convincing evidence. E.g., In re Birdneck Apartment Assocs., II, L.P., 156 B.R. 499, 507 (Bankr. E.D. Va. 1993) ("Before a plan can be 'crammed down' over the objection of a dissenting creditor the debtor must establish by clear and convincing evidence that the plan is fair and equitable."). Other courts "require proof by a preponderance of the evidence in situations involving 'fair and equitable' treatment under 11 U.S.C. § 1129(b)(2)." Matter of Atlanta S. Bus. Park, Ltd., 173 B.R. 444, 447 (Bankr. N.D. Ga. 1994) (describing adoption of this standard as the "trend" among courts in

consequence of the Supreme Court's decision in Grogan v. Garner, 498 U.S. 279, 111 S. Ct. 654 (1991)). The parties did not address the question of which standard of proof applies, and because even the higher "clear and convincing" standard is satisfied in this case, the court does not need to address this issue.

The focus of the inquiry in this case is whether the *partial* surrender of collateral proposed by the debtor grants SunTrust the indubitable equivalent of its claim. It is generally understood that when a secured creditor receives *all* of the property to which its lien attaches, the creditor has received the full value – the "indubitable equivalent" – of its monetary claim, because "common sense tells us that property is the indubitable equivalent of itself." Matter of Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir. 1989). When a debtor's plan calls for surrender of *a portion* of the property in full satisfaction of the debt, however, the assessment becomes more complicated. SunTrust did an admirable job of collecting and discussing decisions that analyze the varying means by which courts across the country have wrestled with this issue, including a decision from the bankruptcy court for this district, which acknowledges the propriety of a "dirt for debt" plan and sets forth the criteria pursuant to which the court should evaluate such a plan. See In re Fazekas, Case No. 92-02262-8-JRL (Bankr. E.D.N.C. May 17, 1993).

In Fazekas, the "central issue" before the court was whether the debtor's plan to convey to the creditor only three of the five properties securing the creditor's claim in the original amount of $530,616.40 provided "sufficient value to be the indubitable equivalent of [the creditor's] claim." Fazekas, slip op. at 6. The court had no difficulty in generally accepting collateral payment as an appropriate method of satisfying a secured creditor's claim and also approved of the concept of partial surrender in full satisfaction of a debt, noting that not only is there "nothing inherently

improper about a collateral payment arrangement," it is, in fact, specifically contemplated by the Bankruptcy Code.  Fazekas, slip op. at 6 (citing 11 U.S.C. § 1123(a)(5)(B), which provides that a plan shall "provide adequate means for the plan's implementation, such as . . . transfer of all or any part of the property of the estate to one or more entities" ).  The Fazekas court noted that the most challenging aspect of this scenario typically comes in valuation of the properties.  See, e.g., In re Arnold & Baker Farms, 85 F.3d 1415, 1423 (9th Cir. 1996) (finding "dirt for debt" plan could not be confirmed and noting that whether the amount of collateral given is sufficient to provide the indubitable equivalent of the claim is, in context of partial surrender of secured property, "entirely" dependent on court's valuation of collateral).  The case before us is no exception.

In Fazekas, the court relied on a three-step valuation process.  Fazekas, slip op. at 7.  First, the court determined the present fair market value for each property.  Next, the fair market value was reduced by 10% in recognition of the sales commission typically charged by real estate brokers in the district, which the creditor would likely incur upon sale of a property.  Fazekas, slip op. at 7.  Last, the court applied a discount rate to the net value of each property to "reflect costs associated with [the creditor's] loss of the use of its money during the time the properties remain unsold." Fazekas, slip op. at 8.  The facts and issues in Fazekas are substantially similar to those before the court today, and the court will, in this case, apply the analysis employed in that one.  Specifically, this court will adopt a fair market value of the properties which is then discounted for appropriate costs and present value.

**Valuation**

Other courts evaluating the surrender of collateral in satisfaction of a debt in dirt for debt scenarios have undertaken a conservative approach to valuation.  In a contested confirmation

hearing, the court's assessment of the evidence indicative of value should be conservative, in light of the uncertainties involved: "[V]aluation is not an exact science, and the chance for error always exists. A conservative approach should, therefore, be taken in order to protect the secured creditor in this regard." In re Simons, 113 B.R. 942, 947 (Bankr. W.D. Tex. 1990); see also, e.g., Matter of Atlanta S. Business Park, Ltd., 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994) (quoting Simons and discussing the rationale behind conservative valuation in dirt for debt cases).

To determine the value of the property the debtor proposes to surrender, the court carefully examined and considered the numerous real property appraisals entered into evidence by the debtor (ten of which were commissioned by SunTrust or its agents). There was testimony that the property was first appraised at the time the loan was made in 2006, prior to construction. The property was appraised again in June of 2008 at a value of $8,750,000.[3] The appraisals at issue herein were undertaken over an almost eight-month period with the first inspection taking place on December 16, 2009, and the last taking place on August 12, 2010.[4] The values contained therein ranged from $3,450,000 to $4,540,000 for all fifteen condominium units and from $1,300,000 to $1,550,000 for the parking lot. The majority of the appraisals used a "hybrid" valuation method, which relied on both the sales comparison and income approach models as recognized by the Uniform Standards for Professional Appraisal Practice (USPAP) for assessing the value of real property. Those appraisals using, in part, the income approach model, had standard discount rates ranging from twelve to fifteen percent (12%-15%) and entrepreneurial discount rates that varied from ten to twenty percent (10%-20%). The discounted cash flow analyses contained in the appraisals provide the court with

---

[3]See Exhibit F.

[4]See Exhibits A, B, C, D, E, G, H, I, J, and M.

the respective appraisers' opinions on value and applicable holding costs and present value discounts, and thus follow the rubric set forth in the Fazekas case. Having carefully considered all of the evidence in this matter, the court gave greater weight to the appraisals completed by Mr. Worsley on August 10, 2010 for the parking lot (Exhibit A) and August 12, 2010, for the condominiums (Exhibit B) as a basis for its determination of value.[5]

The difficulty in employing any of the appraisals admitted into evidence without substantial extrapolation is that none of them offered a value on the specific units surrendered. And, unfortunately, neither did the testimony of any of the appraisers. Because isolation of this value is essential to resolution of the question before the court, it was necessary to adjust the findings detailed in the appraisal reports to reflect the value of only the units to be surrendered by the debtor. Once that value was determined, the court used the formulas set forth in the debtor's Exhibit X to perform a discounted cash flow analysis.

---

[5] It is undisputed that Mr. Worsley communicated with representatives of SunTrust after his submission of Exhibit C (the "restricted appraisal"), which resulted in a value of $4,540,000, and then issued Exhibit B, with a value of $4,000,000. Mr. Worsley admitted to correcting errors in his earlier "restricted" appraisal of the condominiums (Exhibit C) in testimony given on August 20, 2010. Correction of those errors resulted in his generation of Exhibit B. Mr. Worsley explained that his first appraisal had been prepared quickly in anticipation of an earlier trial date.

The court does have serious concerns regarding the implications of appraisers running their "initial" opinions of value by a client/creditor, or their attorney, before rendering a "final" opinion of value. However, Mr. Worsley credibly testified that his conversations with SunTrust's agents after his generation of Exhibit C related to only his appraisal of the parking lot, and thus did not affect his final value on the condominiums. Since the court did not rely heavily on the appraisals performed by Mr. Ingram, the questionable propriety of his communications with SunTrust while preparing his various appraisals have no effect on this ruling.

The Condominium Units

The testimony regarding Bannerman Station was entirely consistent on one point: it is a superior project, in excellent condition, with a good location and amenities not found in comparable projects. In his most recent appraisal, Mr. Worsley found that the average unit price at Bannerman Station was $370,000.[6] Using his assumptions as a base, but modifying them in light of the court's view of the evidence, the court has determined that $385,000 is the more appropriate average unit price. The modifications made to arrive at that figure are summarized below.

1. Mr. Worsley employed five comparable sales in deriving his sales comparison valuation. See Ex. B at p. 23. Four of those sales, Comparables 1-4, were in the Bannerman Station complex. Comparable 5 is in the Modern Baking project. All of the sales occurred within approximately thirteen months of the appraisal.

The court excluded Comparable 3 from consideration. Comparable 3 was one of only two units in Bannerman Station that comprised a living area of over 2,000 square feet, and its size is almost 700 square feet larger than the next comparable property listed in the appraisal.[7] Additionally, Comparable 3 and its twin unit have already been sold, and there are no existing units among those remaining which are similar in square footage. Consideration of Comparable 3 would, therefore, unduly depress the value per square foot analysis. There also appear to be circumstances surrounding the sale of that property which suggest that it may have been sold pursuant to a less than arms-length transaction.

---

[6] Exhibit B at p. 25.

[7] Exhibit 4 at p.1 and Ex. B.

Less weight also was given to Comparables 4 and 5. The court has concerns with the significant adjustments made to the price per square foot values for Comparables 4 and 5, which were in excess of 20% total adjustments for each, before arriving at their respective indicated prices per square foot.[8] Such large adjustments invariably increase the risk of error in an appraisal valuation. The circumstances surrounding the sale of Comparable 4 make clear to the court that it, too, was a less than arms-length transaction. Comparable 5 also is significantly smaller in square footage as compared to the condo units here in question, and by all accounts is in an inferior location, lacking the amenities and overall appeal of the subject property.

2. Certain typographical errors and inconsistencies were corrected.[9]

3. Actual rental and management figures testified to by Mr. Todd Teconis were inserted into the analysis. Mr. Worsley testified that he would have used them if they had been available to him at the time he did the appraisals.

---

[8] A 20% condition of sale adjustment and a -1% time adjustment was applied to Comparable 4, and a -6% time adjustment, a 5% adjustment for Amenities, a 5% adjustment for Physical Characteristics, and a 5% adjustment for Location were applied to Comparable 5.

[9] There are numerous and various typographical errors on Exhibit B. For example, Comparable 5 is described as having 2,056 square feet on page 23, but 1,056 square feet on page 24. Exhibit B cited a "10% annual downward adjustment" to Comparables 3 and 4 on page 23, but then applied that figure to Comparables 1 and 2 on page 24 instead.

4.       A discount for entrepreneurial profit was removed.[10]   There was no evidence indicating an entrepreneurial discount would be appropriate in this case, although the court notes that entrepreneurial profit, or "discount," or "incentive," sometimes is a crucial element of appraisals for proposed construction and development, because without a monetary inducement to actually undertake development, no developer would do so.  See, e.g., In re Loews Cineplex Entm't Corp., 2004 WL 875819 *4 (S.D.N.Y. 2004) (describing "entrepreneurial profit" as the "reasonable profit that a typical developer would seek for the risks and efforts required by a developmental project").  Mr. Worsley testified that entrepreneurial profit serves as an incentive to facilitate development of property "from initiation to completion" and as a reward for the risk.  See Ex. B at p. 29.  By contrast, the Bannerman Station units are complete and need no further development.

At the hearing, Mr. Wilkinson testified that an entrepreneurial profit discount would only be appropriate if the units were sold in bulk to a developer.  SunTrust has not yet committed to a marketing plan, but it appears more likely than not that the surrendered units will be sold individually.  Mr. Wilkinson acknowledged that selling the units individually would be a realistic option and Mr. Ingram opined that individual sales would be the more probable route.  Mr. Scott Lindsay testified that SunTrust was working on a financing package to offer to prospective

---

[10]Entrepreneurial profit "is an element of project costs because no one would build a project except with the expectation of profit.  For appraisal purposes, it is a market-driven figure that reflects entrepreneurial expectation, and can take the form of profit on sale, additional return on investment, or use value to the entrepreneur."  John Collen, Buying and Selling Real Estate in Bankruptcy, Am. Bankr. Inst. 041504-ABI-CLE 969 at n. 71 (quoting The Appraisal Institute, The Appraisal of Real Estate 317 (10th ed. 1992)).  Entrepreneurial profit is a variable element that is "hard to estimate because, among other reasons, it is hard to get reliable data on expectations," and is one of the "most uncertain" elements in appraisal methodology.  Collen, Buying and Selling, at n. 57 and p. 4.

purchasers of individual units. SunTrust objected to the plan on the basis that it subjected SunTrust to competition with the debtor on the sale of units, which also tends to show an intent by SunTrust to market the units individually.

Finally, SunTrust introduced documentary evidence of government-imposed appraisal regulations requiring a bulk sale analysis when more than four units are involved.[11] The court is not compelled to follow those regulations when determining value and chooses not to do so in light of the more probable disposition of the property. In recognition of SunTrust's option to market and offer financing on the property as single units and the fact that all improvements to the property have been completed, a discount for entrepreneurial profit would be inappropriate.

5. An average of actual square footage of the surrendered units was used. The debtor's plan specifically sets forth which units will be surrendered and Exhibit 4 lists the square footage of each unit.

After making the adjustments referred to above, the court arrived at a price of $263 per square foot as a fair market value.[12] The court will use the average condominium square footage for the specific eleven units to be surrendered under the plan, which is 1,464 square feet per unit. That square footage multiplied by $263 per square foot produces an average value of $385,000 per unsold condominium unit.

---

[11] See Exhibits 6 and 8.

[12] The court notes that Mr. Teconis testified that his opinion of the value per square foot was between $320 and $325. The court adopts a more conservative estimate of value, which is closer to the bottom of the $250 to $324 range set forth in SunTrust's appraisals. See Exhibits B, C, D, E, F, H and G.

The Parking Lot

The court adopts the value given by Mr. Worsley in his appraisal of August 10, 2010, for the parking lot to be surrendered. The debtor introduced testimony concerning a pending sale of similar, but inferior land, in close proximity to the subject property, for the amount of $1,600,000. That sale is to close by the end of the year. The tax value of the subject property in 2007, albeit three years ago and in a substantially different economic environment, was $8,000,000. The parking lot property is income producing although, according to Mr. Worsley, the highest and best use of the property would be mixed development. The court finds the Worsley appraisal to be credible, most recent in time, with no persuasive evidence contradicting Mr. Worsley's valuation or procedure. Therefore, for purposes of this analysis, the value of the parking lot will be set at $1,550,000.

Exhibits X and Y

The debtor's Exhibits X and Y were the only items introduced into evidence which provided the court with a discounted cash flow analysis based on the sale and absorption rate of only the eleven condominium units being surrendered. SunTrust did not dispute the debtor's methodology in Exhibit X. Exhibit X uses a 12% discount factor and Exhibit Y employs a 10.15% discount factor.

A determination of the present value of collateral takes into account the time value of money and "compensates the creditor for not receiving its money today by charging an additional sum based on a rate of interest called the 'discount rate.'" In re Bryson Props., XVIII, 961 F.2d 496, 500 (4th Cir. 1992) (internal quotations omitted), cert. denied, 506 U.S. 866 (1992). In Bryson Properties, the Fourth Circuit adopted Collier's rule for determination of an appropriate discount rate:

>The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the Court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration to the quality of the security and the risk of subsequent default.

Bryson Props., 961 F.2d at 500 (quoting 5 Collier on Bankruptcy ¶ 1129.03(4)(f)(I) at 1129-85 (15th ed. 1990)). Based on the evidence presented by both the debtor and SunTrust, which supported a discount rate of between 10.15% and 15%, the court chooses to adopt for its analysis the 12% discount rate used by Mr. Worsley. This is in fact a conservative rate when one considers the purpose of a discount rate: to compensate a creditor for the time value of money.[13] Considering the low level of present-day interest rates, a 12% discount rate would clearly not overstate value and should provide reasonable cushion to the creditor.

The court substitutes the "average unit price" of $385,000 under the "Assumptions" portion of Exhibit X, while leaving all other assumptions as stated. Commissions were adjusted to reflect the lower "average unit price," but the actual rental and management fees from the testimony were maintained. No changes were made to the calculations in Exhibit X for the parking lot. The resulting mathematical calculation for the units and the parking lot derived a "sum of discounted cash flows" of $4,779,925.

## CONCLUSION

SunTrust holds a secured claim in the amount of $4,642,660.44. Based on the foregoing analysis, the present value of the property proposed to be surrendered to SunTrust under the debtor's plan is $4,779,925. The court finds that based upon what it deems to be a conservative approach

---

[13] See In re Grandfather Mountain Ltd. P'ship, 207 B.R. 475 (Bankr. M.D.N.C. 1996); see also C. Frank Carbiener, Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate, 32 S.D. L. Rev. 42 (1987).

to valuation and the circumstances of this case, the property to be surrendered has an "excess value" of over $137,000, which suffices to satisfy the indubitable equivalent standard of § 1129(b)(2)(A)(iii). The court cautions that such an equity to value ratio will not always satisfy the standard and, in fact, an equity to value ratio may not always even be the relevant inquiry. The court's conclusion is based upon the facts of this case; the undisputed appeal and condition of Bannerman Station and the surrendered units; the fact that the debtor relied upon the lender's own appraisals to support its valuation; the market trend evidence for the Wilmington area;[14] the unique ability of SunTrust to offer financing to prospective purchasers,[15] if it so chooses; and the court's usage of conservatively determined square foot value and discount rate figures.

All cases are fact specific, some more so than others. This is a "more so" case. Any cramdown scenario involving the partial surrender of collateral, especially real property, and especially real property in a down market, poses challenges in the crucial process of valuation. Whether excess value constitutes value sufficient to satisfy the indubitable equivalent standard of cram down is an especially case specific determination. This case offers a textbook example of the need to present, in any dirt for debt case and especially in a "partial dirt" for debt case like this one, evidence focused on the value of the specific property to be surrendered. With that in mind, litigants

---

[14] Mr. Teconis testified that there was no new construction of residential units, resulting in a shrinking inventory, and that absorption rates increased from 2009 to 2010. See also Exhibits Q, R, T, U, V and W.

[15] Mr. Worsley testified that if SunTrust were to provide financing for the surrendered units, the absorption period would be reduced, resulting in an increase in value.

17

involved in partial dirt for debt cases are encouraged to precisely focus evidentiary presentations on the value of surrendered property. Such focus will simplify the valuation process and the ultimate determination of indubitable equivalence.

For the foregoing reasons, the court concludes that the real property the debtor proposes to surrender to SunTrust, specifically that property consisting of eleven condominium units and a parking lot as described in Class 4 of the debtor's chapter 11 plan, constitutes the indubitable equivalent of the debtor's debt to SunTrust and this is a fair and equitable treatment of SunTrust's claim. Therefore, the plan will be CONFIRMED.

**SO ORDERED**.

**END OF DOCUMENT**