```
                UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NORTH CAROLINA
                       SOUTHERN DIVISION
                      No. 7:11-CV-00009-H
```

```
IN RE: BANNERMAN HOLDINGS,   )
LLC,                         )
                             )
     Debtor.                 )
                             )
_____)
                             )
SUNTRUST BANK,               )
                             )
     Appellant,              )
                             )
                             )
     v.                      )
                             )
BANNERMAN HOLDINGS, LLC,     )
                             )
     Appellee.               )
```

```
      ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
         FOR THE EASTERN DISTRICT OF NORTH CAROLINA
                       WILSON DIVISION
```

This matter is before the court on appeal from an order of the United States Bankruptcy Court for the Eastern District of North Carolina confirming the Debtor's Chapter 11 plan over the objection of Appellant, SunTrust Bank. The parties have thoroughly briefed the issues on appeal and the matter is now ripe for adjudication.

### BACKGROUND

Bannerman Holdings, LLC (the "Debtor" or "Bannerman"), a North Carolina Limited Liability Company located in Wilmington,

North Carolina, is in the business of buying, selling, and leasing real estate. SunTrust Bank ("Appellant" or "SunTrust") is Bannerman's largest secured creditor. In 2006, SunTrust financed Bannerman's acquisition and development of Bannerman Station, a condominium development in downtown Wilmington. Bannerman executed a note in favor of SunTrust in the amount of $13,500,000.00, which was secured by a first-priority security interest in the Bannerman Station property and a parking lot (the "Parking Lot"). Bannerman was unable to pay the note in full when it matured on March 1, 2008. SunTrust provided Bannerman a two-year extension, but it ultimately remained unable to repay the note and filed a Chapter 11 bankruptcy petition on February 12, 2010.

Bannerman filed a Plan of Reorganization and subsequent modifications (collectively, the "Plan"), which proposed in pertinent part: (1) to satisfy SunTrust's claim in full by transferring to SunTrust eleven of the fifteen remaining unsold condominium units in Bannerman Station and the Parking Lot; (2) to satisfy the claims of all unsecured creditors and McKinley Building Corporation ("McKinley"), a junior lien holder, by transferring one condominium to McKinley; and (3) to retain for Bannerman three condominium units, free and clear of all liens. SunTrust objected to the Plan, and the bankruptcy court subsequently held a three-day confirmation hearing, during which

the bankruptcy court heard evidence concerning the value of the condominium units. On October 20, 2010, the bankruptcy court entered an order confirming Bannerman's plan over the objection of SunTrust. The bankruptcy court concluded that the plan was fair and equitable, because the surrender of the eleven condominiums and the Parking Lot provided SunTrust with the indubitable equivalent of its claim, as contemplated by section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

SunTrust sought from the bankruptcy court a stay pending appeal, which was denied. SunTrust then sought from this court a stay pending appeal, which was also denied. SunTrust filed a notice appealing the bankruptcy court's confirmation order on January 11, 2011. This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a).

### COURT'S DISCUSSION

I.  Standard of Review

The court will not set aside any findings of fact by the bankruptcy court unless they are clearly erroneous. Fed. R. Bankr. P. 8013. "A finding of fact is clearly erroneous only when 'the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made.'" In re Reg'l Bldg. Sys., Inc., 320 F.3d 482, 485 (4th Cir. 2003) (quoting In re Morris Commc'ns, N.C., Inc., 914 F.2d 458, 467 (4th Cir. 1990)). A bankruptcy court's conclusions of law are

3

reviewed de novo. Terry v. Meredith (In re Meredith), 527 F.3d 372, 375 (4th Cir. 2008).

The parties disagree as to the appropriate standard of review in this case. SunTrust, relying on cases outside of the Fourth Circuit, contends that the bankruptcy court's determination of whether the Plan provided it with the indubitable equivalent of its claim is a mixed question of law and fact, but that the ultimate determination of indubitable equivalence is a question of law requiring statutory construction. See, e.g., In re Arnold & Baker Farms, 85 F.3d 1415, 1421(9th Cir. 1996) ("Although the value of the land is a finding of fact which we review for clear error, the ultimate conclusion of indubitable equivalence is a question of law which we review de novo because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code's 'cram down' scheme."). Bannerman, citing no case law, contends that the indubitable equivalence determination is one of fact that turns on the value of the property.

Although there is no authority directly on point, the Fourth Circuit Court of Appeals has previously held that the determination of indubitable equivalence, albeit in the context of providing adequate protection under 11 U.S.C. § 361(3), "is a question of fact rooted in measurements of value and the credibility of witnesses." In re Snowshoe Co., Inc., 789 F.2d

4

1085, 1088 (4th Cir. 1986); see also In re James Wilson Assocs., 965 F.2d 160, 172 (7th Cir. 1992) ("[T]he question whether the interest received by a secured creditor under a plan of reorganization is the indubitable equivalent [under 11 U.S.C. § 1129(b)(2)(A)(iii)] of his lien is one of fact, In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986), and our review is therefore deferential."); In re Criimi Mae, Inc., 251 B.R. 796, 799 (Bankr. D. Md. 2000) (noting that creditor conceded that indubitable equivalence under 11 U.S.C. § 1129(b)(2)(A)(iii) is a question of fact and citing In re James Wilson Assocs. and In re Snowshoe Co.). The court sees no reason that a different standard of review would apply to an indubitable equivalence determination based on whether it was made in the context of adequate protection or plan confirmation. That being said, the court need not decide that issue today, because even under the most deferential standard of review, the bankruptcy court's decision must be reversed.

## II. Equitable Mootness

Bannerman argues that this appeal is equitably moot and should be dismissed without consideration of the bankruptcy court's order. SunTrust counters that equitable mootness does not apply in this case because the court can provide SunTrust with effective relief without disturbing the core provisions of the Plan.

5

"The doctrine of equitable mootness represents a pragmatic recognition by courts that reviewing a judgment may, after time has passed and the judgment has been implemented, prove 'impractical, imprudent, and therefore inequitable.'" In re U.S. Airways Group, Inc., 369 F.3d 806, 809 (4th Cir. 2004) (quoting Mac Panel Co. v. Va. Panel Corp., 283 F.3d 622, 625 (4th Cir. 2002)). "Within the context of a bankruptcy proceeding, a court may dismiss an appeal as equitably moot 'when it becomes impractical and imprudent to upset the plan of reorganization at this late date.'" Id. Factors to consider in determining whether an appeal is equitably moot are: "(1) whether the appellant sought and obtained a stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially consummated; (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties." Id. Having carefully considered these factors, the court concludes that this appeal is not equitably moot.

Although SunTrust failed to obtain the stay it sought, this court's decision denying that stay was based on a finding that SunTrust did not show it was likely to suffer irreparable harm absent a stay of the bankruptcy court's order. In re Bannerman

6

Holdings, LLC, No. 5:10-cv-532-H (Jan. 26, 2011 Order Denying Stay at 3) [DE #15]. Bannerman had argued, in opposition to the motion for stay, that in the event the bankruptcy court was reversed, "SunTrust will have access to $1,292,264.56 worth of the Debtor's property to satisfy its claim" because "the Debtor could transfer the three units that it retained to provide additional collateral as this Court may require." Id. (Debtor's Resp. to Stay Motion at 8-9) [DE #8]. Bannerman cannot now complain that the court is unable to provide relief to SunTrust without a complete unraveling of the Plan. The only interests that are necessarily impacted by a reversal of the bankruptcy court's order are those of Bannerman, and the relief SunTrust seeks may be granted without upsetting the Plan provisions with respect to third parties.

### III. Indubitable Equivalence

SunTrust argues that the bankruptcy court erred (1) in concluding that the Plan provides it with the indubitable equivalent of its claim pursuant to 11 U.S.C. § 1129(B)(2)(A)(iii); and (2) in valuing the property. The court need not reach the second issue, because it finds the indubitable equivalence question dispositive of this appeal. See In re Arnold & Baker Farms, 85 F.3d at 1422 (concluding that bankruptcy court's valuation was not clearly erroneous, but that

7

value of property did not provide the indubitable equivalent of the secured claim).

As the bankruptcy court correctly explained:

> Because at least one impaired class has accepted the plan, the court may confirm the plan notwithstanding SunTrust's objection if the plan does not discriminate unfairly and is fair and equitable to SunTrust. 11 U.S.C. § 1129(b). A secured creditor's treatment may be deemed fair and equitable if it satisfies one of the three criteria set forth under § 1129(b)(2)(A). The debtor contends that its treatment of SunTrust provides "for the realization by [SunTrust] of the indubitable equivalent of [its] claims." § 1129(b)(2)(A)(iii).
>
> . . . .
>
> The focus of the inquiry in this case is whether the partial surrender of collateral proposed by the debtor grants SunTrust the indubitable equivalent of its claim. It is generally understood that when a secured creditor receives all of the property to which its lien attaches, the creditor has received the full value – the "indubitable equivalent" – of its monetary claim, because "common sense tells us that property is the indubitable equivalent of itself." Matter of Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir. 1989). When a debtor's plan calls for surrender of a portion of the property in full satisfaction of the debt, however, the assessment becomes more complicated.

(Order Confirming Plan ("Conf. Order") at 5 [DE #2-38].) The bankruptcy court next undertook a thorough valuation analysis and determined that the value of the eleven condominiums and the Parking Lot Bannerman proposed to surrender to SunTrust under the Plan was $4,779,925.00. (Id. at 7-16.) Finally, the bankruptcy court concluded that the $4,779,925.00 in proposed

8

surrendered property provided SunTrust with the indubitable equivalent of its $4,642,660.44 claim: "The court finds that based upon what it deems to be a conservative approach to valuation and the circumstances of this case, the property to be surrendered has an 'excess value' of over $137,000, which suffices to satisfy the indubitable equivalent standard of § 1129(b)(2)(A)(iii)." (Id. at 16-17.) Having carefully considered the bankruptcy court's order and the evidence before it at the confirmation hearing, the court finds that the bankruptcy court's ruling was clearly erroneous.

A.  The Test for Indubitable Equivalence

The bar for a finding of indubitable equivalence is exceedingly high:

> This burden is more than a mere preponderance of the evidence and more than even beyond a reasonable doubt, but rather the indubitable equivalence of a cash payment on the date of confirmation. The burden is akin to a clear and convincing standard. Where the creditor is earmarked to receive part of its collateral, any such plan will be subject to extremely close scrutiny to insure that the creditor will actually receive the indubitable equivalent of its secured claim.

In re Prosperity Park, LLC, No. 10-31399, 2011 WL 1878210, at *4 (Bankr. W.D.N.C. May 17, 2011) (internal citations omitted). The concept of indubitable equivalence found in the Bankruptcy Code was taken from Judge Learned Hand's opinion in In re Murel Holding Corp., 75 F.2d 941, 942 (2d Cir. 1935). See In re Sandy

Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir. 1989) (citing 124 Cong. Rec. H 11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S. Code Cong. & Admin. News 6436 at 6475.)  Judge Hand reasoned that a judge could "equitably and fairly" provide adequate protection to an objecting creditor where the debtor declined to satisfy the creditor through traditional means, e.g., maintenance of the creditor's liens, sale of the collateral, or payment of the value of the liens.  In re Murel Holding Corp., 75 F.2d at 942. However, Judge Hand cautioned that "[i]n construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform."  Id.  He further explained:

> It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

Id. (emphasis added).  Therefore, to make a finding that a creditor has been provided with the indubitable equivalent of its claim, there must be "no doubt that the secured creditor receives consideration equal to its claim in value or amount." In re Philadelphia Newspapers, LLC, 559 F.3d 298, 326 (3d Cir.

10

2010) (noting that <u>Webster's Dictionary</u> defines "indubitable" as "not open to question or doubt" or "too evident to be doubted"). Said another way, where there is considerable doubt as to the underlying value of the property to be surrendered, the risk that the creditor will not realize the value of its claim is too great and the indubitable equivalence standard will not be met.

B.  <u>Analysis</u>

In this case, the valuation evidence presented to the bankruptcy court was wide ranging. The bankruptcy court noted that the parties introduced "evidence of eleven appraisals, generated by three different appraisers and performed between July 2008 and August 2010[.]"[1] (Conf. Order at 3.) The appraisals for the fifteen unsold condominiums that were considered by the bankruptcy court were conducted between December 16, 2009 and August 12, 2010 and ranged in value from $3,450,000 to $4,540,000. (<u>Id.</u> at 8.) Appraiser Hector Ingram issued two appraisals: the first valued the condominiums as of December 16, 2009 at $3,450,000 (<u>Id.</u> at 3), and the second valued the condominiums as of June 30, 2010 at $3,575,000 (Appellant's Br. at 6). Appraiser Earl Worsley also valued the

---

[1] The appraisals submitted with respect to the condominiums were commissioned by SunTrust. (Conf. Order at 3.) SunTrust contends that the bankruptcy court overstated the number of appraisals and that there were actually three appraisals of the condominiums plus revisions. At the confirmation hearing, testimony on valuation was presented by three appraisers and Bannerman's member-manager, Todd Toconis.

condominiums, first at $4,540,000 and later at $4,000,000 in a corrected appraisal. (Conf. Order at 8, 9 n.5.) Other variable factors in the appraisals included the following: the average price per square foot ranged from $250 to $325 (id. at 13); the discount rate ranged from 12% to 15% (id. at 8); and the entrepreneurial discount ranged from 10% to 20% (id.).

The wide-ranging valuations presented to the bankruptcy court, even among SunTrust's own appraisers, are indicative of the uncertainty in the value of this particular property. See In re Arnold & Baker Farms, 85 F.3d at 1422 ("The large disparity in the parties' valuation of the same property illustrates the obvious uncertainty in attempting to forecast the price at which real property will sell at some uncertain future date."). This court recognizes, as did the bankruptcy court, that "valuation is not an exact science, and the chance for error always exists." (Conf. Order at 8 (quoting In re Simmons, 113 B.R. 942, 947 (Bankr. W.D. Tex. 1990)).) However, as the uncertainty of the valuation increases so does the risk of error. In the present case, the wide-ranging valuations are indicative of uncertainty and weigh against a finding of indubitable equivalence.

In addition to the fact that the valuation evidence presented to the bankruptcy court was wide ranging, the bankruptcy court made material adjustments to the appraisal

12

evidence. The bankruptcy court took the average unit price of $370,000 from Worsley's corrected appraisal, then (1) "adjust[ed] the findings detailed in the appraisal reports to reflect the value of only the units to be surrendered by the debtor" (Conf. Order at 9); (2) excluded or discounted three of the five comparables used in the appraisal (id. at 10-11); and (3) eliminated a discount for entrepreneurial profit (id. at 12).

First, the bankruptcy court found it necessary to make adjustments to the appraisal evidence because the evidence presented did not reflect the value of the specific eleven condominiums to be surrendered, but instead reflected the value of all fifteen unsold condominiums. The bankruptcy court recognized the problem this presented when it stated, "The difficulty in employing any of the appraisals admitted into evidence without substantial extrapolation is that none of them offered a value on the specific units surrendered. And, unfortunately, neither did the testimony of any of the appraisers." (Conf. Order at 9.) The bankruptcy court went on to caution future litigants against offering imprecise valuation evidence: "This case offers a textbook example of the need to present, in any dirt for debt case and especially in a 'partial dirt' for debt case like this one, evidence focused on the value of the specific property to be surrendered." (Id. at 17

13

(emphasis added).) Yet, while generally recognizing the problem, the bankruptcy court appears to have not taken into account, when conducting its indubitable equivalence analysis, the uncertainty this "substantial extrapolation" added to its valuation. Bannerman points out that the bankruptcy court "devotes eight pages to explaining how it methodically reached a conservative valuation of the property." (Appellee's Br. at 13 [DE #16].) However, the extensive valuation analysis undertaken by the bankruptcy court stands in stark contrast to its one paragraph indubitable equivalence analysis, in which it failed to acknowledge any uncertainty or risk that its calculation overvalued the property. (Compare Conf. Order at 7-14, with Conf. Order at 16-17.)

Next, the bankruptcy court eliminated or discounted the three lowest ($232, $252, and $217 per square foot) of the five comparables used by Worsley and relied on the two highest comparables ($292 and $302 per square foot). (Conf. Order at 10-11; Appellant's Br. at 14-15.) The bankruptcy court determined that the appropriate price per square foot was $263 and thoroughly explained its rationale for adjusting the comparables. (Conf. Order at 10-11.) However, it is not the accuracy of the adjustment that is at issue here, it is the inherent uncertainty that adjustments generally inject into a valuation. The bankruptcy court recognized as much when it

14

criticized Worley's adjustments to comparables 4 and 5. (See Conf. Order at 11 ("Such large adjustments invariably increase the risk of error in an appraisal valuation.").)

Finally, the bankruptcy court eliminated the discount for entrepreneurial profit. The bankruptcy court found that an entrepreneurial discount was inappropriate given that SunTrust had the option to market and offer financing on the condominiums as single units as opposed to selling them in bulk to an investor. (Conf. Order at 12-13.) At the confirmation hearing, SunTrust had not committed to a marketing plan, but the bankruptcy court found it more likely than not that the surrendered units would be sold individually. (Id. at 12.) Based on the appraisers' testimony at the confirmation hearing with respect to entrepreneurial profit, were SunTrust to now sell the condominiums in bulk, it would most certainly be at a value less than that calculated by the bankruptcy court:

> Well, the entrepreneurial profit is the incentive to make someone come out and buy all of these units. You know, this is a three-and-a-half-million-dollar purchase. In order to encourage someone to put that kind of money down and then handle the risk of selling out the units, as we've seen through our absorption projections, it's pretty hit and miss how quickly these units sell so there is some significant risk to that. And that 15 percent [entrepreneurial discount] we make the assumption would be enough to compensate an individual to come in and buy the bulk number of units and then handle the sales process.

(Aug. 26, 2010 Conf. Hr'g at 47-48.)  The complete exclusion of any entrepreneurial discount further increased the risk that SunTrust would not be fully compensated on its secured claim. See In re Arnold & Baker Farms, 85 F.3d at 1422 ("If [the creditor] subsequently sells the property for less than the value calculated by the bankruptcy court, [the creditor] has no recourse to the remaining collateral to satisfy the deficiency. As a result, the distribution to [the creditor] may not be 'completely compensatory.'").

The valuation evidence submitted to the bankruptcy court was wide ranging and each adjustment made injected further uncertainty into already tenuous valuation evidence. See In re Arnold & Baker Farms, 85 F.3d at 1422 (concluding that partial dirt for debt plan did not provide creditor with indubitable equivalent of its secured claim where the "evidence at trial demonstrated that the value of the real property was far from certain.").  Furthermore, each of these adjustments served to increase the value the bankruptcy court placed on the condominiums.  (See Conf. Order at 10 (adjusting average unit price upward from appraisal of $370,000 to $385,000).)

The court also finds troubling that one of the factors relied on by the bankruptcy court in support of its indubitable equivalence determination was "the market trend evidence for the Wilmington area."  (Id. at 17.)  The bankruptcy court cited the

16

testimony from Toconis, "that there was no new construction of residential units, resulting in a shrinking inventory, and that absorption rates increased from 2009 to 2010." (Id. at 17, n.14.)  Worley, upon whose appraisal the bankruptcy court founded its valuation, conceded in response to questioning that the downtown Wilmington condominium market may have leveled off and cannot continue to drop, as suggested by Bannerman, but he concluded that the market is still "bouncing along the bottom." (Aug. 20, 2010 Conf. Hr'g Tr. at 86.)  When later questioned about this assessment, Toconis agreed:

> Q: I think it was Mr. Worsley and perhaps Mr. Ingram that talked about bumping along the bottom. In your experience, Mr. Toconis, and what you see and what you do every day, are we still on the bottom?
>
> A: Yes, I believe we are still on the bottom.
>
> Q: Okay. Which way are we heading? Are we still bumping?
>
> A: I think that we are bumping, but you have to understand that Wilmington and specific New Hanover County is a very limited land mass, unlike like Raleigh here where, you know, you can just continue to grow out and out and out. Wilmington doesn't have anywhere to really grow to and the recession has caused no new construction, no new building, no new subdivision developments, no new condo projects, so we're lucky in the fact that our inventory is slowly decreasing and as that inventory decreases, home values will go back up.

(Aug. 27, 2010 Conf. Hr'g Tr. at 62.)  The court views none of these statements as positing a favorable condition in the current relevant market.  The fact that a bad market is not

17

getting worse or has shown some hope of future improvement is cold comfort to a creditor being asked to forgo a portion of its security in full satisfaction of its secured claim.  See In re Walat Farms, Inc., 70 B.R. 330, 334 (E.D. Mich. 1987) ("[N]o matter how hot the market for real estate may become in the future, the market for farm real estate here and now is not such which would permit us to hold that the value of the land being offered is the indubitable equivalent of Equitable's claim.").

The bankruptcy court concluded that a $137,000 margin between its estimated value of the property to be surrendered and SunTrust's claim was sufficient to satisfy the indubitable equivalence standard.  Bannerman argues that no margin of error or equity cushion is required when a bankruptcy court uses a conservative valuation.  See In re Atlanta S. Bus. Park, Ltd., 173 B.R. 444, 451 n.5 ("[I]t would be inappropriate to value conservatively the property and require the Debtor to provide a margin of error of, for example, thirty percent. Both these measures serve the same purpose of compensating a creditor for the risk it will incur upon being forced to accept the collateral in lieu of cash payments.").  It is worth noting that in Atlanta Southern Business Park the debtor compensated the creditor with both a partial surrender of the secured creditor's collateral and cash.  173 B.R. at 451.  There is no uncertainty in the value of cash.  Furthermore, the secured creditor in

18

Atlanta Southern Business Park was to receive a total of $812,957.90 in real property and cash on its $663,150.23 claim, id. at 451-52, which actually provided a 22% equity cushion and distinguishes Atlanta Southern Business Park from the present case.

Most certainly, there are cases where the conservative nature or lack of uncertainty of a valuation leaves no doubt that the value of the proposed property to be surrendered is the indubitable equivalent of the creditor's secured claim. See In re May, 174 B.R. 832, 836 & 840 (Bankr. S.D. Ga. 1994) (finding indubitable equivalence on 1.5% margin where both parties' appraisers were in "complete agreement" as to the value of the units to be surrendered). This is not such a case. The $137,000 (less than 3%) margin of error here is far too slim given (1) the wide-ranging valuation evidence; (2) the "substantial extrapolation" the bankruptcy court found necessary in order to value the condominiums; and (3) the unfavorable conditions of the relevant market. It is worth repeating that "indubitable" means "not open to question or doubt." In the present case, the court is left with substantial doubt that the value of the proposed property to be surrendered is the indubitable equivalent of SunTrust's secured claim.

## CONCLUSION

For the foregoing reasons, the bankruptcy court's order confirming the Debtor's Chapter 11 plan is VACATED and the case is REMANDED to the bankruptcy court for further proceedings consistent with this order. Debtor's motion for oral argument [DE #18] is DENIED. The clerk is directed to close this case.

This 30th day of September, 2011.

_____
MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC
bfb